UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 11-CR-324 (PJS/LIB) |
| v. | **REPORT AND RECOMMENDATION** |
| JOHN JOSEPH DOUGLAS, | |
| Defendant. | |

---

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure executed on May 31, 2011. The case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on November 29, 2011 and received testimony from St. Louis County Deputy Sheriff Kim Hanegmon, Hoyt Lakes Police Department Officer Kevin Green, and St. Louis County Deputy Sheriff Investigator Mark Steele. For reasons outlined below, the Court recommends that Defendant's motion to suppress be denied.

**I.    BACKGROUND**

On May 30, 2011, at approximately 12:10 a.m., police received a 911 call from Mercedes Adams reporting that she heard gunshots near her home in Aurora, Minnesota. Three separate police departments were involved in the response: the St. Louis County Sheriff's Office, the Hoyt Lakes Police Department and the Gilbert Police Department.[1] On the way to Ms. Adams's home, St. Louis County Deputy Sheriff Kim Hanegmon was notified that a second 911 call was

---

[1] Officer Green testified, at the hearing, that it was not unusual for these officers to provide backup for each other.

received regarding gunshots in the same area. The second caller reported hearing five shots, and during the call, two more shots can be heard on the recording.[2]

Upon Deputy Hanegmon's arrival, Ms. Adams informed her that the gunshots appeared to come from a nearby property where no one had resided for years after a fire had burned down the only house on the property. Ms. Adams further explained that shortly before hearing the gunshots, she had seen two vehicles driving towards the property: a blue SUV and a silver sedan. While speaking to Ms. Adams, Deputy Hanegmon heard several more gunshots and believed that they came from the property that Ms. Adams previously identified.

The property described by Ms. Adams was near Allen Junction Road and north of Highway 110. The officers proceeded northbound on Allen Junction Road, until they observed a small bonfire through the trees on the property that Ms. Adams had described. The property was a large grass clearing in a rural part of Minnesota in a very wooded area. It was surrounded by trees and was only accessible by an unpaved, grass-covered driveway through the trees. Because the only house on the property had burned down a long time ago, there were no standing structures left, with the exception of a portion of a stone wall and the stone chimney that were once part of the house. As later discovered, the property was owned by Defendant's aunt and uncle who have lived in North Carolina for the past eighteen years. They had given Defendant permission to visit the property but had not given him permission to shoot guns or drink alcohol on the property. They had also asked him to stop by the property periodically to make sure that it was "safe" and make sure that the "No Trespassing" signs remained posted.

After some discussion as to the safest way to approach the property—given that the property was wooded, it was dark, and gunshots were heard—the officers decided that they

---

[2] At the hearing, Deputy Hanegmon and Officer Green acknowledged that a gravel pit in the area was sometimes used as an "informal" firing range, and it would not be entirely unusual to hear gunshots in the area. However, the officers both testified that it would be unusual to hear shots at 12:10 am.

would approach in their squad cars. On arrival, the officers observed several people, a camp fire, and two vehicles: a blue SUV and a silver sedan—matching the description of the vehicles given by Ms. Adams. Defendant immediately approached Deputy Hanegmon and demanded that the officers leave. Deputy Hanegmon informed Defendant that they had received 911 calls about gunshots fired from the property and asked where the gun was located. Defendant denied that there was a gun on the property and again told the officers to leave.

During a protective sweep around the camp fire, Officer Green observed several cans of beer, a bottle of vodka, a box of ammunition, and several spent shotgun shell casings, which Officer Green concluded were recently fired because they were dry, without any dew on them, and smelled of gun powder. Additionally, Officer Green encountered two teenage girls hiding behind one of the vehicles. Initially, they denied the presence of a gun. For the safety of the officers, Deputy Hanegmon escorted the two girls into her squad car while the officers continued their investigation. While talking to the girls, they admitted to Deputy Hanegmon that a gun had been fired immediately before the officers arrived and described a sawed-off type shotgun. However, they could not provide the location of the gun. Additionally, two males, who were standing around the campfire, also denied the presence of a gun and denied that any shots had been fired from the property.

Shortly thereafter, the officers learned that Defendant was on probation from St. Louis County District Court and the terms of his probation prohibited him from possessing firearms, ammunition, drugs, and alcohol. Defendant was not willing to take a Preliminary Breath Test (PBT) test, as required by the terms of his probation, without first talking to his lawyer. Because he refused to take the PBT test, the officers placed him under arrest.

While arranging for sober rides for all the people at the scene, Officer Green walked around the camp fire to try to locate the "sawed-off" shotgun. He did so out of concern for public safety—he believed that leaving a "sawed-off" shotgun in an open area would be dangerous. Furthermore, because of how dark it was, Officer Green could not be sure that other people, who might gain access to the shotgun, were not present on the property. Approximately 20 yards from the camp fire, Officer Green observed an abandoned refrigerator. The refrigerator was in the bushes, away from the remnants of the house, laying on its side, had no top or bottom, and was thoroughly rusted-out—such that grass and weeds were growing through it. In its condition, it more closely resembled the metal frame of a box more than it did a refrigerator.

There was a compartment toward the bottom of the refrigerator that had a board partially over it, and Officer Green observed a part of a shiny black plastic bag sticking out of that compartment; upon approaching the abandoned refrigerator, the black plastic bag could clearly be seen through the refrigerator opening. Without opening or unwrapping the plastic, Officer Green moved the wooden board, touched the object in the plastic, and felt what he believed was something similar to the butt-end of a rifle. After informing Deputy Hanegmon what he had found, Deputy Hanegmon called a supervisor, Lieutenant Steele, to ask how she should proceed. He directed her to seize the object. After photographing the location of the object and the refrigerator, Deputy Hanegmon removed the plastic bag from the refrigerator, unwrapped the object inside it and found a "sawed-off" shotgun—matching the description of the gun provided by the two girls. At the hearing, Deputy Hanegmon acknowledged that she probably could have left an officer to secure the premises while she sought to obtain a search warrant, but she did not do so.

**II.   DISCUSSION**

Defendant argues that the sawed-off shotgun obtained from the search of the property should be suppressed because he had a reasonable expectation of privacy in the property and no exigent circumstances existed, which would support an exception to the requirement of a search warrant.  Although the Government did not dispute Defendant's claim that he had a reasonable expectation of privacy in the premises, (Letter to Mr. Goetz from Andrew Dunne dated November 30, 2011 (citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978))), the Court disagrees.  As more fully discussed below, the Court finds that Defendant had no reasonable expectation of privacy in the plastic bag left in the rusted-out refrigerator remnants abandoned in the middle of an open field that had no structures near it.  Because the Court finds that Defendant had no reasonable expectation of privacy in the property searched, no warrant was required.[3]

To challenge the lawfulness of a search under the Fourth Amendment, Defendant must first demonstrate that he had a reasonable expectation of privacy.  Rakas v. Illinois, 439 U.S. 128, 143 (1978) ("[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.").  Equally well-established is that a person has no expectation of privacy in open fields.  Oliver v. U.S., 466 U.S. 170, 181 (1984) ("[A]n individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers.").  Furthermore, the term "open fields" is read broadly and does not require that the property be either "open" or a "field."  Id. at 180 n.11 ("[A] thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment.").

---

[3] Accordingly, the Court need not address whether any exceptions, such as exigent circumstances exist in this case. Although the exigencies of the situation may explain the practicalities of why the police officers acted in the manner that they did, they have no bearing on the Court's analysis.

The property where the plastic bag was found was an open field. There were no habitable structures that remained on the property. The only residence located on the property had burned down a long time ago and no one lived on the property. Indeed, Defendant concedes that "[t]he property searched was in a rural area without any dwellings and surrounded by woods." (Def.'s Mem. of Law in Supp. of Mot. to Suppress Evidence [Docket No. 30] at 7). Defendant acknowledges that no structure remained on the property that could be considered to contain a curtilage. There was no house on the property and no one had resided there for many years. That "No Trespassing" signs were posted in several locations on the property does not make the open field one where a person has a reasonable expectation of privacy, and courts will not engage in a case-by-case analysis to determine whether a person has a reasonable expectation of privacy in an open field. See Oliver, 466 U.S. at 181-83; U.S. v. Burton, 894 F.2d 188, 190 (6th Cir. 1990) (stating that Oliver expressly rejected a practice of case-by-case analysis on whether a person holds a reasonable expectation of privacy in an open field). Nevertheless, Defendant argues that the open fields doctrine does not apply in this case because the item seized was not in plain view. (Def.'s Mem. of Law in Supp. of Mot. to Suppress. Evidence at 18). In support of this proposition, Defendant cites only United States v. Pennington, 287 F.3d 739, 745 (8th Cir. 2002), and one other case citing Pennington. Defendant reads the court's holding in Pennington too broadly, and it is important to initially note that the court in Pennington did not even suppress the evidence.

In Pennington, police followed a trail from the defendant's trailer into a field. Pennington, 287 F.3d at 745. Three hundred yards from the home, they found a trash bag containing some incriminating items. Id. They also observed a wooden pallet covering an underground entryway and a ladder extending into a tunnel below. Id. Investigating into the

tunnel, the officers found more incriminating evidence buried twelve feet underground. Id. Although the incriminating evidence in the tunnel was not protected by a locked door, and the entryway was not locked, it was not visible from the surface. Id. Defendant challenged the search of the underground tunnel. The court held that the area was an "open field," and stated, without providing citation, that the "open fields doctrine only allows a search of what is in plain view in the open field. It does not justify a warrantless search of a **man-made enclosure** found in an open field." The court's man-made enclosure qualification is important. Without deciding the issue, as it is not directly before it, the Court notes that several courts have held that a person has a reasonable expectation of privacy in certain man-made enclosures, even though they are located in an open field. See, e.g., United States v. Smith, 623 F. Supp. 2d 693, 707-08 (W.D. Va. 2009) (holding that the defendant had a reasonable expectation of privacy in a locked, unhitched trailer located in the middle of an open field); United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993) (affirming a district court's holding that a person has a reasonable expectation of privacy in a barn located in an open field). However, no such circumstances exist in this case. The search here was of a plastic bag located within a rusted-out refrigerator abandoned in an open field. The police did not have to enter a man-made enclosure to find it.

Furthermore, in Pennington, Defendant never challenged, and the court did not address the search of the garbage bag found on the surface of the open field. The search of the garbage bag, rather than the tunnel, is more analogous to the search in this case—a plastic bag sitting in an open field. Even more telling, however, is that the court did not believe the evidence obtained from the underground tunnel needed to be suppressed. See Pennington, 287 F.3d at 745-46 ("The officers who discovered its entryway would have been well advised to seal the surrounding area and apply for a second warrant. But given the location of the underground

bunker in an open field, its readily visible entryway with an unprotected ladder facilitating access to the tunnel, and no lock or door impeding access, we conclude the district court did not err in denying this portion of Pennington's motion to suppress."). Therefore, the court's statement in dicta that "open fields doctrine only allows a search of what is in plain view in the open field," is not as broad as Defendant argues. Even under the holding in Pennington, the evidence should not be suppressed because the bag at issue in the present case was "locat[ed] in an open field," was "readily visible," and "no lock or door imped[ed] access."[4]

Defendant does not challenge the seizure of the shotgun shells found on the ground at the property as such a challenge would be unsuccessful. See Patler v. Slayton, 503 F.2d 472, 477-78 (4th Cir. 1974) (holding that the recovery of spent bullets and shell casings from a picnic area, which the court classified as an open field, was proper without a warrant). However, because the shotgun was wrapped in a plastic bag and found in a rusted-out refrigerator, Defendant argues that the open fields doctrine does not apply.[5]

An Eighth Circuit case, with facts more analogous than Pennington, confirms that Defendant's reading of Pennington is too broad. In United States v. Stallings, 28 F.3d 58, 59

---

[4] The only other case cited by Defendant in support of his plain view argument is United States v. Longie, 370 F. Supp. 2d 941, 945 (D.N.D. 2005). In Longie, officers followed a path from the defendant's house to a **shed** in the backyard. Longie, 370 F. Supp. 2d at 944. The court held that the shed was not within the curtilage of the house, and the defendant "had no reasonable expectation of privacy in the shed." Id. at 945. Nevertheless, acknowledging that "the warrantless search of the shed is a close issue under the open fields doctrine" and reasoning that the officers could have "easily secured the shed and applied for a second warrant prior to their warrantless entry of the shed," the court suppressed the evidence. Id. at 945-46. A shed is clearly a "man-made enclosure" and is entirely different from the abandoned, rusted-out refrigerator in this case. Thus, the Court finds that the facts in this case do not present such a "close issue," and that Longie falls within the line of authority regarding man-made enclosures that the Court has already distinguished.

[5] At the outset, the Court finds that the plastic bag was found in the remnants of the refrigerator is immaterial. First, no evidence was presented that Defendant had any ownership or possessory interests in the refrigerator remnants. Second, the remnants of the refrigerator were clearly abandoned a long time ago, as indicated by its condition. There is no reasonable expectation of privacy in abandoned objects left in an open field. See Hester v. United States, 265 U.S. 57 (1924) (holding that the defendant had no standing to challenge the seizure of whiskey jugs that were thrown into an open field); Hardy v. Cnty. of El Dorado, No. 2:07-cv-0799 JAM EFB, 2008 WL 4911254, at *5 (E.D. Cal. Nov. 13, 2008) (holding that a person has no reasonable expectation of privacy in abandoned vehicles in an open field). Third, the refrigerator remnants had no back and no door, such that the plastic bag could easily be seen without having to "open" the refrigerator. Therefore, Defendant had no reasonable expectation of privacy in the refrigerator remnants.

8

(8th Cir. 1994), the defendant had left a green tote bag, which was zipped shut, in an open field adjacent to his house. When the officer initially observed the bag, "nothing about [it] at that time led him to believe there was anything illegal about it." Id. The defendant did not own or lease the field. Id. Reasoning that "animals, children, scavengers, snoops, and other members of the public had access to the tote bag," the court affirmed the district court's holding that the defendant "did not have an objectively reasonable expectation of privacy in the tote bag he left in the field." Id. at 61.

The Eighth Circuit's holding in Stallings is on point. Similar to the defendant in Stallings, Defendant in this case left a bag in an open field, not in a man-made enclosure. Defendant did not own or lease the field where the bag was found.[6] The bag "bore no indicia of ownership indicating it belonged to [Defendant]." Id. at 61 n.4. Furthermore, the Fourth Circuit has even held that a person has no reasonable expectation of privacy in the unlocked trunk of a "junker" car left in an open field owned by the defendant's father. See United States v. Ramapuram, 632 F.2d 1149, 1154-56 (1980). The court in Ramapuram rejected the defendant's similar argument that the "covered, closed character of the junker's trunk foreclosed any right to open it." Id. at 1155. It explained that "whatever expectation of privacy attends a closed but unsecured 'effect' generally is diminished where the 'effect' itself is placed in an area totally without the protection of the Fourth Amendment such as in an open field." Id.

Even if Defendant held a subjective belief that he had an expectation of privacy in the plastic bag left in the open field, it was not a reasonable expectation of privacy. See Oliver, 466

---

[6] At the hearing, Defendant presented evidence that he would check-up on the property periodically because his aunt and uncle lived so far away. He would make sure that the "No Trespassing" signs remained posted and that the property remained safe because his uncle was concerned about people getting injured on the property. This, however, was not an ownership interest in the property, and there was no evidence that Defendant had authority to regulate access to the property, as evidenced by the fact that he had to call his aunt in an attempt to persuade her to tell the officers to leave. Defendant's aunt never told the officers that they must leave, but merely stated that "he [Defendant] wants me to tell you to leave."

9

U.S. at 182-83 ("The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment."). The Court is unwilling to hold that a person has a reasonable expectation of privacy in a plastic bag left in a rusted-out refrigerator abandoned in an open field with no habitable structure anywhere near it. Defendant provides no authority with similar circumstances that holds to the contrary. "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area or item searched." Stallings, 28 F.3d at 60 (quoting United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)). The Court finds that Defendant has failed to establish that he had a reasonable expectation of privacy in the plastic bag left in the open field, and therefore, recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of a Search and Seizure be denied.

### III. CONCLUSION

1. Based on the foregoing, and all the files, records and proceedings herein,

    **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 14] be denied.


Dated: December 12, 2011
s/Leo I. Brisbois
LEO I. BRISBOIS
United States Magistrate Judge

### N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by December 26, 2011**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the

objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.