UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 11-CR-0324 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| JOHN JOSEPH DOUGLAS, | |
| Defendant. | |

Andrew S. Dunne and Jeffrey M. Bryan, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Frederick J. Goetz, GOETZ & ECKLAND, P.A., for defendant.

This matter is before the Court on the motion of defendant John Joseph Douglas for a new trial pursuant to Fed. R. Crim. P. 33(a) and 33(b)(1). On February 10, 2012, Douglas was found guilty by a jury of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Douglas now alleges that newly discovered evidence — specifically, the recantation of the testimony given at trial by witness Anthony Petric — casts doubt on the validity of that verdict. The Court denies Douglas's motion for the reasons set forth below.

I. BACKGROUND

On May 30, 2011, Douglas attended a high-school-graduation party in Aurora, Minnesota. That evening, six of the party guests — Douglas, Petric, Raina Compton, Rachel Ryberg, Mark Dorstad ("Dorstad"), and Ethan Dorstad — retired to a bonfire on a wooded parcel of land owned by a relative of Douglas. Around midnight, neighbors called police after hearing gunshots coming from the area where the bonfire was being held. After arriving at the

scene, police officers found a sawed-off shotgun wrapped in plastic and hidden in an abandoned refrigerator.  Douglas was arrested for violating the terms of his probation by refusing to submit to an alcohol test, and his five companions returned to the home where the graduation party had been held.

Petric, Compton, and Ryberg testified at trial,[1] and their testimony was substantially identical.  Petric and Ryberg testified that Douglas went into the woods and returned with the shotgun, while Compton said that she could not recall who retrieved the shotgun from the woods.  All three witnesses testified that Douglas loaded the shotgun, and all three witnesses testified that Douglas fired the shotgun several times.  All three witnesses also testified that Douglas helped Compton hold and fire the shotgun.

The testimony given by the three witnesses at trial did not vary materially from the recorded statements given by the three witnesses to police in the hours immediately following the incident.  Steel Aff. Exs. 1-3, July 27, 2012 [ECF No. 98] ("Steel Aff.").  In those recorded statements, all three witnesses said that Douglas had loaded and fired the weapon.  Ryberg and Petric said that Douglas had retrieved the weapon from the woods.  Ryberg and Petric also said that Douglas had referred to the shotgun as his "toy."  All three witnesses said that Douglas wrapped the shotgun in dark plastic after he was finished firing it.[2]

---

[1] Douglas and Dorstad invoked their Fifth Amendment right against self-incrimination and did not testify at trial.

[2] The first recorded statements of the three witnesses do differ from one another in one important respect:  Ryberg and Compton said that only Douglas fired the shotgun, while Petric said that Compton also fired the shotgun (with Douglas's help).  Soon afterward, however, Ryberg and Compton admitted to police that Compton had also fired the shotgun.  And, as explained below, the fact that there was this discrepancy between the initial statement of Petric and the initial statements of Ryberg and Compton makes Petric's new story even more difficult to believe.

There is no evidence that, between the time that they first spoke to police and the time that they testified at trial, any of these three witnesses materially changed their accounts of the incident. In other words, from the day of the incident to the day of the trial, each witness gave accounts that were consistent with one another and with the accounts of the other two witnesses.

On April 25, 2012, over two months after Douglas was convicted, Petric mailed a handwritten note to Douglas's attorney recanting his testimony. Specifically, Petric alleged that *he* had fired the shotgun at the bonfire and that he did "not recall John Douglas shooting or touching the gun at all." Petric Aff. at 3, June 21, 2012 [ECF No. 81] ("Petric Aff."). He further alleged that Compton and Ryberg had lied on his behalf. Petric Aff. at 4. Petric later signed an affidavit reasserting the claims made in the handwritten note. Petric Aff. at 1-2.

## II. ANALYSIS

### A. *Law Governing Motions for New Trial*

To prevail on a motion for a new trial based on newly discovered evidence, a defendant must prove four things: First, the defendant must prove that the new evidence was unknown and unavailable to him at the time of trial. Second, the defendant must prove that he was diligent in attempting to uncover the new evidence. Third, the new evidence must be material. And fourth, the new evidence "'must be such that its emergence probably will result in an acquittal upon retrial.'" *United States v. Baker*, 479 F.3d 574, 577 (8th Cir. 2007) (quoting *United States v. Haskell*, 468 F.3d 1064, 1076 (8th Cir. 2006)).

In general, a motion for a new trial based on newly discovered evidence is "'disfavored,'" *United States v. Johnson*, 114 F.3d 808, 817 (8th Cir. 1997) (quoting *United States v. Doyle*, 60 F.3d 396, 398 (8th Cir. 1995) (per curiam)), and the criteria governing such a motion are "stringent." *Johnson*, 114 F.3d at 814. More specifically, "[m]otions for a new trial

based upon the alleged recantation of a material witness are viewed with disfavor in [the Eighth Circuit] and are difficult to win." *United States v. Papajohn*, 212 F.3d 1112, 1117 (8th Cir. 2000). "The stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial." *United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir. 1997). Moreover, new testimony by a recanting witness is inherently untrustworthy. "[W]here a witness makes subsequent statements directly contradicting earlier testimony the witness either is lying now, was lying then, or lied both times." *United States v. Provost*, 969 F.2d 617, 620 (8th Cir. 1992).[3]

### B. Petric's Post-trial Testimony

The Court held an evidentiary hearing on September 10, 2012. At that hearing, Petric testified that he now cannot recall whether Douglas possessed the shotgun at any point during the bonfire, but he is certain that Douglas never fired the shotgun. Evidentiary Hr'g Tr. at 88, Sept. 10, 2012 ("Tr."). According to Petric, immediately after leaving the bonfire and returning to the home at which the graduation party had been held, Compton and he (and perhaps Ryberg) discussed the events of the evening. Tr. at 74-78. During that discussion, Petric now claims, the two (or three) witnesses decided to concoct a story blaming Douglas for firing the shotgun. *Id*.

The Court finds Petric's testimony difficult to believe for a number of reasons:

---

[3] The Eighth Circuit's skepticism about motions for a new trial based on recanted testimony is not anomalous. *See, e.g., United States v. Wilson*, 624 F.3d 640, 664 (4th Cir. 2010) (stating that "[p]ost-trial recantations are looked upon with the utmost suspicion.") (internal quotations omitted); *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995) (stating that courts "treat witness recantations with the utmost suspicion.") (internal quotations omitted); *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991) (stating that "[r]ecanting affidavits and witnesses are viewed with extreme suspicion.").

*First*, Petric's new story does not make sense. According to Petric, the three witnesses decided in the early morning hours after the bonfire to frame Douglas for the crime. *Id*. But that very same morning, Petric told police that *Compton* had also fired the shotgun. Steel Aff. Ex. 3. It would be irrational for Petric to accuse Compton of firing the shotgun just hours after Compton had agreed to protect Petric by falsely accusing Douglas of firing the shotgun. Petric had nothing to gain and everything to lose if Compton and her friend Ryberg, on learning that Petric had pointed the finger at Compton (as well as at Douglas), got angry at Petric and refused to continue to protect him. And if the three witnesses had agreed to concoct a story to protect Petric at the expense of Douglas, why would they not also protect *Compton* at the expense of Douglas? Why would Compton agree to lie to protect Petric, but Petric not agree to lie to protect Compton?

*Second*, it is unlikely that the three witnesses could have pulled off the plot that Petric attributes to them. The three witnesses left the bonfire at about 1:30 a.m. All three witnesses had been drinking heavily, first at the graduation party and then at the bonfire. Tr. at 19. Ryberg and Compton gave their first recorded statements to the police at about 3:45 a.m. — just over two hours after leaving the bonfire. The accounts given by Ryberg and Compton in those recorded statements were substantially the same — even as to relatively minor details — and those statements have withstood interrogation by police, questioning by prosecutors, and cross-examination at trial. According to Petric, however, these detailed, credible, and consistent stories were concocted within a period of about two hours by intoxicated and tired witnesses. Not only did those witnesses concoct their stories (according to Petric's new account), but they memorized them sufficiently to withstand interrogation by the police. This is simply not believable.

-5-

This is even less believable when one considers the fact that Ryberg may not have even participated in the concoction of the story. Petric initially testified at the evidentiary hearing that Ryberg had gone to bed immediately after returning to the home, while Compton and he stayed up and discussed the scheme. Tr. at 75. Petric claimed that Compton must have relayed the details of the false story to Ryberg before Compton and Ryberg made their first statements to the police. Tr. at 74. For this to be true, though, Petric and Compton needed to have created the false story down to the smallest details — again, while being tired and under the influence of alcohol — and then Compton needed to wake up Ryberg and rehearse that story with her sufficiently to ensure that what Ryberg would tell the police would match what Petric and Compton planned to tell the police.

*Third*, Petric contradicted himself at points during the evidentiary hearing. For example, Petric first testified that Ryberg had *not* participated in the story-concocting discussion, Tr. at 74-75 — but then, after a short recess, Petric returned to the stand and talked about the discussion as though Ryberg *had* participated, Tr. at 77. Similarly, Petric first testified that he could not remember who carried the weapon away into the woods after the group was finished firing it, Tr. at 57-58 — but then, again after the short recess, Petric returned to the stand and testified that Dorstad had done so, Tr. at 96. When asked about these inconsistencies, Petric said that he remembered the information during the break. *Id*. Petric has had over a year since the bonfire — and several months since his recantation — to think about exactly what happened; it is highly unlikely that he would remember for the first time during a short recess the critical fact that Dorstad had gone into the woods with the shotgun. In short, Petric managed to tell his "old" story consistently for many months. And yet Petric was unable to keep his "new" story straight over the course of a single court hearing.

*Fourth*, Petric's new testimony favored Douglas to such an extent that it conflicted not only with the testimony of Compton and Ryberg, but also with the testimony of the law-enforcement officers who were at the scene. Without exception, every witness at the trial (including Petric) testified that Douglas was agitated and hostile to the police when the police arrived at the property, and that Douglas told his companions not to talk to the police. Petric now says that he remembers *someone* saying those things, but he cannot be sure it was Douglas. Tr. at 96-97. His recantation on this detail is not credible.

Similarly, Petric alleged in his written recantation that his trial testimony had been "scripted" by the prosecutors. Petric Aff. at 3. But Petric's trial testimony was substantially similar to the statements that he had given to the police on the morning following the bonfire — long before Petric even met a prosecutor. And under cross-examination, Petric admitted that he had *not* been told by the prosecutors to lie. Tr. at 68. All of this suggests that, in his recantation, Petric was not telling the truth, but instead saying things that he thought would help Douglas.

*Fifth*, Petric has a strong motive to lie. Almost all of the people involved in this case live near each other on the Iron Range, and many of them are related in some way to John Douglas. Dorstad is the uncle of Karen Maynard, who is Douglas's fiancee and the mother of Douglas's child. Tr. at 14. Dorstad is also Petric's surrogate uncle; Dorstad's sister (the mother of Douglas's fiancee and the grandmother of Douglas's child) took Petric into her home when he was a teenager and helped to raise him. Tr. at 70.

The most credible testimony Petric gave during the evidentiary hearing pertained to his affection for the extended Dorstad family. Petric's loyalty to that family permeated his written recantation and his testimony at the evidentiary hearing. In his recantation, Petric writes that "all of us are like family and it is wrecking our relationship, and I want to do the right thing because

this has gone on too long." Petric Aff. at 4. At the evidentiary hearing, Petric reasserted that sentiment, saying "family to me is number one. Family always comes first no matter what." Tr. at 13. He later testified that he felt as though he had "done good for the family by stepping up and doing my part. . . ." Tr. at 14.

Petric's recantation was written on April 25, 2012. Less than one month earlier, the United States Probation and Pretrial Services Office had circulated its initial Presentence Report ("PSR") regarding Douglas. The PSR found that Douglas qualified as an armed career criminal under § 4B1.4 of the Sentencing Guidelines, that Douglas was subject to a minimum sentence of 15 years' imprisonment pursuant to 18 U.S.C. § 924(e)(1), and that the Sentencing Guidelines recommended a sentence of 360 months to life. These matters were far from clear before the PSR was circulated. In short, then, less than one month before Petric recanted, Douglas's extended family learned that (if the PSR is correct) Douglas will be sent to prison for a minimum of 15 years — and might be sent to prison for more than 30 years — all for firing a shotgun at a bonfire. It is not a stretch of the imagination to believe that Petric felt tremendous pressure — direct or indirect — to "take the fall" for Douglas. Because Petric has no criminal record, the punishment that Petric will face if his recantation is accepted will be trivial in comparison with the punishment that Douglas will face if Petric's recantation is not accepted.

*Finally*, the Court observed the testimony of Ryberg, Compton, and Petric at trial, and, based on their demeanor and the content of their testimony, found their testimony to be credible. Following Petric's recantation, Ryberg and Compton signed affidavits affirming that their testimony at trial was true. Ryberg Aff., July 27, 2012 [ECF No. 96]; Compton Aff., July 27, 2012 [ECF No. 97]. Conversely, the Court observed the testimony of Petric at the evidentiary

hearing and, based on his demeanor and the content of his testimony, found his testimony not to be credible.

In light of all of these facts, the Court finds that it is extremely unlikely that Petric's recantation and the "emergence" of his new testimony "will result in an acquittal upon retrial." *Baker*, 479 F.3d at 574 (internal quotations omitted). For that reason, Douglas's motion for a new trial is denied.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendant's motion for a new trial [ECF No. 79] is DENIED.

Dated: October 19, 2012         s/Patrick J. Schiltz
                                Patrick J. Schiltz
                                United States District Judge