UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 11-CR-0324(1) (PJS/LIB) |
| | Case No. 15-CV-1218 (PJS) |
| Plaintiff, | |
| v. | ORDER |
| JOHN JOSEPH DOUGLAS, | |
| Defendant. | |

Andrew S. Dunne, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Andrew S. Garvis, KOCH & GARVIS, LLC, for defendant.

A jury convicted defendant John Douglas of being a felon in possession of a firearm. ECF No. 64. Douglas filed a motion for a new trial, which the Court denied after an evidentiary hearing. ECF No. 105. The Court then sentenced Douglas under the Armed Career Criminal Act (18 U.S.C. § 924(e)) to 240 months in prison and 5 years of supervised release. ECF No. 112. The United States Court of Appeals for the Eighth Circuit affirmed Douglas's conviction on direct appeal. *United States v. Douglas*, 744 F.3d 1065 (8th Cir. 2014).

This matter is before the Court on Douglas's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The Court appointed counsel to assist

Douglas and held an evidentiary hearing on Douglas's claims.[1]  For the reasons that follow, the Court denies relief on all of Douglas's claims save for his claim under *Johnson v. United States*, 135 S. Ct. 2551 (2015).  As to that claim, the Court will defer ruling until the Supreme Court decides whether and how *Johnson* applies to the career-offender guideline—a decision that should come before the end of the present Term. *See Beckles v. United States*, 136 S. Ct. 2510 (2016).

## I.  BACKGROUND

Douglas attended a graduation party on the afternoon of May 30, 2011.[2]  Also attending the party were, among others, Raina Hoiland,[3] Rachel Ryberg, Anthony Petric, Mark Dorstad, and Dorstad's young son.  Later that evening, Douglas, Hoiland, Ryberg, Petric, and the Dorstads drove to a wooded lot owned by Douglas's aunt and uncle, Paul and Mary Easter.  The group sat around a bonfire, drinking beer.  Douglas asked the others if they would like to see his "toy."  He went off into the woods, returned with a sawed-off shotgun wrapped in a plastic bag, took the gun out of the

---

[1]The Court also granted Douglas's request for a change of counsel before the evidentiary hearing.  ECF Nos. 149, 150.

[2]The record is somewhat inconsistent concerning whether the date was May 29 or May 30.  The discrepancy makes no difference.

[3]By the time of trial, Hoiland had married and her surname was Compton.

bag, and shot the gun multiple times.  Douglas then helped Hoiland shoot the gun a few times and returned the gun to its hiding place in the woods.

A neighbor heard the gunshots and called the police, who arrived on the Easter property about five minutes after the last shot was fired.  On seeing the police approach, Hoiland and Ryberg hid behind a car because they were not of legal drinking age.  After the officers arrived, Douglas was agitated and hostile, repeatedly demanding that the officers get off of the property and even calling his aunt to try to enlist her help in getting the police to leave.  Several of those present denied that anyone had fired a gun, but Hoiland and Ryberg eventually told the officers that Douglas had done so. The officers searched the property, found the shotgun, and arrested Douglas on a probation violation.  The Court denied Douglas's motion to suppress the gun.

The focus of the trial was the testimony of three eyewitnesses—Hoiland, Ryberg, and Petric—all of whom told the jury that Douglas had retrieved and fired the shotgun.[4] Douglas's defense attorney, Frederick Goetz, worked hard to discredit their testimony. Goetz was able to elicit evidence that the shotgun actually belonged to Dorstad; that Dorstad was in the habit of keeping the gun in his car and calling it his "little buddy"; and that Dorstad liked to show off the gun.  Goetz also elicited evidence that Dorstad had asked Petric to lie to the police.  Specifically, Petric testified that, at Dorstad's

---

[4]Neither Douglas nor the Dorstads testified.

request, he had falsely told police that it was Douglas who had sawed off the shotgun. Petric also admitted that he had persisted in this lie until, shortly before trial, Dorstad admitted that he (not Douglas) had sawed off the gun.

In addition to eliciting this evidence, Goetz highlighted inconsistencies in the eyewitnesses' statements, and Goetz forcefully argued that, comparatively speaking, Douglas was the outsider in the group and thus an easy scapegoat.  Goetz pointed out that both Dorstad and Petric had a lot to lose if they were convicted of a gun charge. Dorstad was entangled in child-custody proceedings, and Petric admitted that he could lose his job.  Finally, Goetz cross-examined the government's expert on gunshot residue, emphasizing the lack of forensic evidence that Douglas had fired the gun. Goetz got the expert to admit that particles found on Douglas's hands were consistent with shooting off fireworks, which Douglas had done earlier in the evening.

The jury convicted Douglas.  A few months later, Douglas moved for a new trial on the basis of newly discovered evidence—specifically, an affidavit from Petric in which he recanted his trial testimony and claimed that only he, and not Douglas, had fired the gun.  Two other trial witnesses—Dorstad's sister and niece—also offered affidavits stating that, after the trial, Dorstad admitted to them that he had hidden the gun on the Easter property and that it was Petric who had been shooting it on the night

in question.  (By contrast, Hoiland and Ryberg submitted affidavits affirming that their

trial testimony had been true.)

After conducting an evidentiary hearing, the Court denied Douglas's new-trial

motion.  The Court identified numerous reasons why Petric's recantation was not

credible and likely the result of pressure from Douglas's family and friends.  The Court

later sentenced Douglas to 240 months in prison, a substantial downward variance from

the 360-months-to-life sentence recommended by the United States Sentencing

Guidelines.  After an unsuccessful appeal that focused on the denial of Douglas's

suppression motion, Douglas filed this motion under 28 U.S.C. § 2255 to vacate, set

aside, or correct his sentence.

## II.  ANALYSIS

### A.  *Standard of Review*

The Sixth Amendment guarantees criminal defendants the right to effective

assistance of counsel.  U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686

(1984).  To prevail on a claim of ineffective assistance of counsel, a defendant must show

that (1) his counsel's performance fell below an objective standard of reasonableness

and (2) there is a reasonable probability that, but for his counsel's errors, the result of

the proceeding would have been different.  *Id.* at 687-88, 694.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.  In reviewing ineffective-assistance claims, a court must be careful to avoid second-guessing counsel's strategic decisions.  "Judicial scrutiny of counsel's performance must be highly deferential. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689.  "We look at counsel's challenged conduct at the time of his representation of the defendant and we avoid making judgments based on hindsight." *Ragland v. United States*, 756 F.3d 597, 600 (8th Cir. 2014) (citation and quotations omitted).  "The defendant bears the burden to overcome the strong presumption that counsel's performance was reasonable." *Thomas v. United States*, 737 F.3d 1202, 1207 (8th Cir. 2013).

### B.  Douglas's Claims

### 1.  Rejected Guilty Plea

Douglas first contends that, if Goetz had properly explained the concept of constructive possession to him, Douglas would have accepted the government's plea offer and thus received a lower sentence.

The sole issue at trial was whether Douglas possessed the shotgun, and the focus of the parties was the credibility of the three witnesses (Hoiland, Ryberg, and Petric)

who testified that Douglas *actually* possessed the shotgun.  But during the prosecutor's closing argument, he very briefly mentioned the concept of *constructive* possession.  Specifically, the prosecutor suggested—almost as an aside—that, even if the jury did not find that Douglas touched the weapon, the jury could still convict him if he knew that the shotgun was on the Easter property and asserted control over that property by asking the officers to leave.  Douglas claims that Goetz never explained this concept of constructive possession to him—and, in particular, that Goetz never told him that he could be convicted merely because he knew of the shotgun and attempted to assert control over the property.  Had he known this, Douglas says, he would have pleaded guilty.

Douglas and Goetz offered conflicting testimony at the evidentiary hearing on Douglas's § 2255 motion.  Douglas testified that Goetz never spoke to him about the concept of constructive possession and that he had never heard of the concept until the prosecutor mentioned it during closing arguments.  By contrast, Goetz testified that he had dozens of discussions with Douglas, and that in many of those discussions he explained the concept of constructive possession (although he may not have used—or always used—the precise term "constructive possession").  Specifically, Goetz testified that he explained to Douglas on multiple occasions that the government did not have to

prove that Douglas actually touched the shotgun, but only that Douglas exercised dominion and control over it.

The Court credits Goetz's testimony that he explained the concept of constructive possession to Douglas. The Court is very familiar with Goetz, who has an active federal practice and who is a highly regarded member of the criminal-defense bar. Goetz is smart, careful, thorough, and devoted to his clients, and Goetz has acted honestly and ethically in all of his many dealings with this Court. Moreover, Goetz's demeanor while testifying was calm, precise, measured, and not at all defensive or evasive. Finally, Goetz's testimony at the hearing was entirely consistent with the documentary evidence. The Court therefore finds that Goetz was telling the truth and that he did, in fact, explain to Douglas that he could be convicted of possessing the shotgun—even if he never touched it—as long as he exercised dominion and control over the weapon.

In testifying to the contrary, Douglas was likely lying. This Court found the trial testimony of Hoiland, Ryberg, and Petric to be credible—and Petric's attempted recantation of his trial testimony to be incredible—and thus this Court necessarily disbelieves Douglas's claim that he never discharged the shotgun. Moreover, Douglas and his supporters have been desperate to get his conviction or sentence vacated; as noted, the Court strongly suspects that they pressured Petric into his clumsy attempt to recant his trial testimony.

It is possible, however, that Douglas simply did not pay much attention when Goetz described the concept of constructive possession. Again, the focus of all of those involved in the trial—defendant, attorneys, jurors, and judge—was on the credibility of the three witnesses whose testimony put the shotgun in Douglas's hands. As the Court explains below, no one could have anticipated that the prosecutor would introduce the concept of constructive possession during his closing argument. It is thus possible that Douglas did not focus on constructive possession until he heard the government suggest in its closing argument that he could be found guilty even if he never touched the shotgun as long as he knew that the gun was stored on the Easter property and asserted control over that property by demanding that the officers leave. Hearing the concept put so starkly in a closing argument may have made more of an impression on Douglas than hearing the concept described more abstractly in the course of numerous pretrial conversations with his attorney.

To the extent that Douglas may contend that Goetz was ineffective because he did not predict and explain the specific theory of constructive possession raised by the government in its closing argument, the Court rejects that contention. The government's constructive-possession argument was, to put it mildly, a stretch. It is true that, when a weapon is found in a defendant's own home, the "normal inference of dominion" permits a jury to find that the defendant possessed it. *See United States v.*

*White*, 816 F.3d 976, 986 (8th Cir. 2016) (citation and quotations omitted).  But the

"normal inference of dominion" did not fit any reasonable view of the evidence in this

case.  Unlike the defendant in *White*, Douglas did not own the property on which the

gun was found.  His defense consisted of evidence that Dorstad owned the gun and that

Petric and Hoiland fired it.  To accept the government's theory of constructive

possession, then, the jury would have to believe that Douglas had both the power and

intent to exercise dominion and control over the gun even though (1) the large wooded

lot on which the gun was hidden belonged to someone else; (2) the gun belonged to

someone else; and (3) Douglas never touched the gun.  *See* ECF No. 63 at 7 (jury

instruction defining "constructive possession").

This is an extremely broad view of the concept of constructive possession.

People are not ordinarily considered to have dominion and control over the personal

property of anyone who comes onto their property.  In this case, however, the

government was stretching the concept even further, arguing that Douglas had

dominion and control over the personal property of anyone who came onto *someone*

*else's* property.  If the government's theory were correct, it would mean that a person

who asks the police (or anyone else) to leave *any* piece of property is in constructive

possession of *everything* on that property of which he was aware—wallets, purses,

jewelry, clothing, cars—regardless of who owns those the items.  On this theory,

Douglas would have constructively possessed the *officers'* weapons (as well as their squad cars and badges).

This is not an accurate view of the law, nor is it a remotely reasonable inference for a jury to draw. To prove constructive possession, the government had to prove that Douglas had the power and intent to exercise dominion and control over the *firearm*; it was not enough to prove that Douglas (unsuccessfully) attempted to exercise dominion and control over the *land* owned by the Easters. *Cf. Henderson v. United States*, 135 S. Ct. 1780 (2015) (permitting a felon to nominate a person to whom a confiscated gun should be given did not amount to constructive possession by the felon). The fact that Goetz did not predict that the government would attempt to use the concept of constructive possession in such an unexpected manner does not render his assistance ineffective. *See Harrington v. Richter*, 562 U.S. 86, 110 (2011) ("an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities").

Douglas also raises several other alleged errors in connection with his decision to reject the government's plea offer. He contends that Goetz failed to explain that chemical particles found on his hands were consistent with firing the gun, and he contends that Goetz erroneously told him that the DNA of two other individuals had been found on the gun.

-11-

The Court credits Goetz's testimony, however, that he thoroughly discussed the results of the gunshot-residue test with Douglas.  In particular, the Court credits Goetz's testimony that he explained to Douglas that the results were inconclusive and that any elements on his hands could be residue from fireworks.

Similarly, the Court credits Goetz's testimony that he never told Douglas that anyone else's DNA had been found on the gun and instead told Douglas that the lab was unable to develop *any* DNA profile from the samples taken from the gun.  Goetz's testimony is corroborated by the fact that Goetz gave Douglas a copy of the two-page lab report, which plainly states that "[n]o DNA profiles were obtained from" the samples collected from the gun.  Goetz Aff. Ex. 1 at 1.  Douglas points to a letter that he later sent to Goetz asking for DNA testing of Petric and Dorstad.  *See* Goetz Aff. Ex. 2 at 1.  Douglas contends that he would not have sent such a letter unless Goetz had told him that DNA had been found on the gun.  But the letter can just as easily be read as a request to keep looking for DNA on the gun—a request that would be consistent with Goetz's testimony that Douglas knew that no DNA had yet been found.

Finally, Douglas claimed that, although Goetz orally told him about a plea offer under which Douglas's potential sentence would be capped at 10 years, Douglas never saw a proposed plea agreement that was attached to an affidavit that Goetz submitted in response to Douglas's § 2255 motion.  *See* Goetz Aff. Ex. 4.  The Court, however,

credits Goetz's testimony that he transmitted the proposed written agreement to Douglas.  Goetz's testimony is corroborated—and Douglas's testimony is contradicted—by a cover letter addressed to Douglas that indicates that Goetz mailed the written plea agreement to him.  *See* Goetz Aff. Ex. 6.

Setting that aside, the proposed written plea agreement that Douglas suggests he would have accepted (had he known of it) contemplates that Douglas could be subject to a 15-year mandatory-minimum sentence under the Armed Career Criminal Act. *See* Goetz Aff. Ex. 4 at 2-3.  If Douglas is to be believed, however, he rejected a plea offer that would have capped his sentence at 10 years.  If Douglas was not willing to accept a 10-year *maximum* sentence, he surely would not have accepted the possibility of a 15-year *minimum* sentence.[5]  Consequently, even if Goetz had failed to convey the written plea agreement to his client, Douglas cannot show prejudice.  *See Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012) (defendant must show that, but for the ineffective advice of counsel, there is a reasonable probability that he would have accepted the plea).

---

[5]Douglas testified that he would have accepted the written plea agreement if he had understood the concept of constructive possession.  As discussed above, however, Goetz adequately explained the concept of constructive possession to Douglas and could not reasonably have been expected to predict the government's specific argument regarding constructive possession—an argument that was both legally and factually unsound.

2.  Failure to Call Expert Witness

At trial, the government presented the testimony of Allison Murtha, an expert on

gunshot residue.  As Murtha explained, discharging a gun creates a plume of vapor that

contains particles of lead, antimony, and barium.  As a result of heat from the discharge

and the density of the plume, some of these particles fuse together into two- and three-

component particles.  When all three elements fuse, the resulting three-component

particles are known as "gunshot residue," and the presence of such residue conclusively

establishes that a gun was fired.  By contrast, although two-component particles are

consistent with a gunshot, they may have other origins, and thus the presence of two-

component particles does not establish that a gun was fired.

Murtha analyzed samples taken from Douglas's hands shortly after he was

arrested.  The collection paperwork indicated that Douglas was not allowed to wash his

hands or otherwise have access to water before the samples were collected.  Murtha

found no gunshot residue and only three two-component particles consisting of lead

and antimony.  At trial, Murtha essentially testified that the particulate evidence was

inconclusive; it neither proved nor disproved that Douglas had fired a gun.  She also

testified that particles are easily removed through such ordinary activity as putting

one's hands in one's pockets or running one's hands through one's hair, and that wind,

rain, and other factors can also reduce or eliminate gunshot residue.

On cross-examination by Goetz, Murtha agreed that the two-component particles found on Douglas's hands were consistent with shooting off fireworks, which Douglas had done earlier that evening. Murtha also admitted that the one-component particles found on Douglas's hands included iron and copper, which are *in*consistent with a gunshot. In his closing argument, Goetz pointed to the lack of gunshot residue on Douglas's hands and argued that, given the number of times that the gun was fired, the short length of time between the last shot and the arrival of police, and the lack of any other factor (such as rain or wind) that would have removed the gunshot residue from Douglas's hands, Douglas could not possibly have fired the gun. Goetz also highlighted the fact that the police had failed to obtain or test samples from Douglas's clothing or from anyone else at the scene.

Douglas's chief complaint about Goetz's handling of the gunshot-residue evidence is that Goetz did not call an expert witness of his own, but instead relied on his cross-examination of Murtha. At the evidentiary hearing on his § 2255 motion, Douglas presented testimony from Christopher Robinson, another gunshot-residue expert. Robinson testified that, contrary to Murtha's claim, the *absence* of gunshot residue on Douglas's hands *did* prove that Douglas had not fired the gun. According to Robinson, the type of shotgun at issue—and the fact that it was sawed off—made it inevitable that gunshot residue would get all over the shooter. Robinson also testified

that standard protocol would have been to take samples from everyone at the scene, and he faulted the police for failing to do so.  Douglas argues that Goetz should have called Robinson or another expert witness to present such testimony at trial.

As noted, in evaluating claims of ineffective assistance of counsel, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.  It is easy, in hindsight, to say that Goetz should have presented expert testimony similar to Robinson's.  "But *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. 86, 111 (2011).  It may be reasonable for an attorney to decide to rely on cross-examination to expose weaknesses in a government expert's testimony.  *Id.*  Likewise, it may be reasonable for an attorney to decide to avoid the risk of exposing a defense expert to cross-examination by the government.  *See Holder v. United States*, 721 F.3d 979, 990-91 (8th Cir. 2013).

Applying these principles, Goetz's decision not to call an expert witness was within the wide range of reasonable professional assistance.  Goetz testified that he considered calling an expert but, in light of the weakness of the government's expert evidence, he decided instead to focus on attacking the credibility of Hoiland, Ryberg, and Petric.  Goetz was correct in assessing the expert evidence as weak; indeed, Goetz

made good use of those weaknesses during closing argument, and he was even able to

make a credible argument that the testimony of the government's expert was more

consistent with Douglas's innocence than with his guilt.

Moreover, Robinson's testimony had its own problems.  Robinson testified that

ample amounts of DNA should have been found on the gun if it had been fired in the

manner described at trial, yet no DNA was found.  As there was no dispute that

*someone* had fired the gun multiple times, Robinson's testimony that a great deal of

DNA should have been found on the gun would have given the government an

opportunity to impeach his testimony.  Robinson suggested that the lack of DNA may

have been the result of incompetence in collecting samples, but Robinson admittedly

knew nothing about how the samples were collected.  A jury might well have

concluded that Robinson was simply not credible—or that the incompetence that

explained the failure to find DNA on the gun also explained the failure to find gunshot

residue on Douglas's hands.  It was reasonable for Goetz to decide, as a matter of

strategy, to avoid a battle of the experts and instead emphasize the weakness of the

government's expert testimony, which he did with skill and vigor.  *Holder*, 721 F.3d

at 990-91 (finding attorney's decision not to present expert testimony was reasonable in

light of potential problems with a defense expert); *see also Richter*, 562 U.S. at 111 ("it is

difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy").

Douglas also contends that Goetz was ineffective because he failed to offer evidence that there is gunshot residue in the soil on the Easter property as well as in any soil where iron-ore mining takes place. But Goetz had no reason to prove an alternative source of gunshot residue for the simple reason that *none was found* on Douglas's hands. To the extent that Douglas may be referring to the two-component particles that were found on his hands, Goetz *did* offer a plausible alternative explanation for those particles: the fact that Douglas had shot off fireworks earlier in the evening. Given the weakness of the government's forensic evidence, Goetz's decision not to offer additional alternative theories was reasonable.

### 3. Failure to Appeal Denial of New Trial

Douglas next argues that Goetz was ineffective because he refused to appeal the denial of Douglas's motion for a new trial, despite Douglas's request that he do so.

As discussed above, a few months after trial, Douglas moved for a new trial on the basis of Petric's recantation. The Court denied the motion after an evidentiary hearing. In denying the motion, the Court identified numerous reasons why Petric's new testimony was not credible, including Petric's demeanor while testifying at the evidentiary hearing. *See* ECF No. 105 at 4-9.

Because "effective appellate advocacy often entails screening out weaker issues, the Sixth Amendment does not require that appellate counsel raise every colorable or non-frivolous issue on appeal." *Roe v. Delo*, 160 F.3d 416, 418 (8th Cir. 1998). In this case, Goetz acted wisely in focusing on the Fourth Amendment issue and forgoing a challenge to the denial of the new-trial motion. The constitutionality of the search that produced the shotgun was a difficult issue, *see* ECF No. 44 at 1 (describing the issue as "close"), and this Court's decision not to suppress the evidence was reviewed de novo, *see Douglas*, 744 F.3d at 1068 (reviewing legality of search de novo). By contrast, this Court's denial of the motion for a new trial would have been reviewed for a "clear" abuse of discretion. *See United States v. Papajohn*, 212 F.3d 1112, 1117-18 (8th Cir. 2000), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). Moreover, the Court's denial of the new-trial motion was based in part on credibility determinations, and a trial judge's credibility determinations are "virtually unassailable on appeal." *See United States v. Garcia*, 646 F.3d 1061, 1072 (8th Cir. 2011) (citation and quotations omitted).

Given these hurdles, there was virtually no chance that the Eighth Circuit would have reversed this Court's denial of Douglas's motion for a new trial. By raising the issue on appeal, Goetz would only have given the government an excuse to dwell on the many absurdities of Petric's recantation and the likelihood that Douglas's family

members or friends put him up to it.  Goetz's decision to focus on his vastly stronger

arguments under the Fourth Amendment—which, incidentally, might have resulted in

an acquittal, as opposed to merely a new trial at which Petric would have been

impeached to devastating effect—was eminently reasonable.

   4. Reasonable Expectation of Privacy and Constructive Possession

  Douglas next argues that Goetz was ineffective because he did not argue to the

jury that Douglas could not have constructively possessed the firearm because, in ruling

on Douglas's suppression motion, the Court found that he lacked a reasonable

expectation of privacy in the plastic bag in which the gun was found.

  There are several problems with this argument:

  First, whether Douglas's expectation of privacy in the bag was objectively

reasonable is a legal question that is separate and distinct from the factual question of

whether Douglas had the intent and the ability to exert dominion and control over the

shotgun.  The Court would therefore not have allowed Goetz to make any argument to

the jury on the basis of the Court's legal conclusions regarding Douglas's reasonable

expectation of privacy in the plastic bag.  In other words, Douglas is faulting Goetz for

failing to make an argument that the Court would not have allowed him to make.

  Second, Goetz *did* argue to the jury that the government's constructive-

possession theory was a misstatement of the law and made no sense under the facts of

the case.  Goetz's argument was entirely proper, and it was the most that Goetz could or should have done on the subject.

Finally, as discussed above, the Court agrees with Goetz that the trial focused almost entirely on the issue of actual, not constructive, possession.  The Court doubts very much that the jury gave even two seconds' thought to the government's constructive-possession argument.  Goetz was wise not to make the argument appear to be more of a threat than it was.

In short, Goetz was not ineffective, nor was Douglas prejudiced by any alleged ineffectiveness.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Defendant John Douglas's motion to vacate, set aside, or correct his sentence [ECF No. 137] is DENIED with respect to all claims save for his claim under *Johnson v. United States*, 135 S. Ct. 2551 (2015).

2.      The Court will defer ruling on Douglas's *Johnson* claim until after the

United States Supreme Court issues its decision in *Beckles v. United States*,

No. 15-8544, *cert. granted*, 136 S. Ct. 2510 (2016).

Dated:  December 22, 2016                          s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge